1  TAMU BLACKWELL

2  355 Grand Avenue – Suite 2450

3  Los Angeles, California 90071

4  (213) 529-9446

5  Tcb2527@gmail.com

6

7  Tamu Blackwell, IN PRO SE

8

9

10

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

11

12

13

14  TAMU BLACKWELL                    Case No.: 2:19 -cv-9977-FLA (MAR)

15

16              Plaintiff,            **[PURPOSED] FOURTH**

17      vs.                           **AMENDED COMPLAINT**

18  THE CIYOF LOS ANGELES, et al

19

20

21              Defendants.

22

23

24              JURISDICTION AND VENUE

25      1.    The claims herein are asserted pursuant to the United States Constitution

26  and 42 U.S.C.§ 1983, et seq., and the jurisdiction of this Court is invoked pursuant to

27  28 U.S.C.§§ 1331, 1343 and 1367.

28

[PROPOSED] FOURTH AMENDED COMPLAINT

FILED

2022 OCT 21  PM 3: 48

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

BY

2.    The acts complained of arose in this district and division, and therefore venue lies in this district and division pursuant U.S.C. § 1391.

PARTIES

3.    The party who makes this Complaint was within the jurisdiction of the United States of America at all times alleged herein.

4.    Plaintiff, TAMU BLACKWELL is an African-American woman over 65 years of age, who lives in an apartment located in the City of Los Angeles and owned by the McCarty Memorial Christian Church. She has lived there for over 30 years, since October of 1991.  Plaintiff, Tamu Blackwell follows a faith other than the religious denomination, "Christian Church (Disciples of Christ)."

5.    All defendants are either California peace officers, California governmental entities, California private corporations and/or employees/agents of those private California corporations, all Defendants acted under color of state law.

**PUBLIC DEFENDANTS ACTING**
**UNDER COLOR OF STATE LAW:**

6.    Defendant Officers: MARTINEZ, ACEVES, CARLOS MALDONADO, ROBERT MALDONADO, RICHARDSON, KOPAECK, SMITH, Defendant Sergeants: BLOCKER, NORWOOD, SIMMONS, Officer Smith's SENIOR LEAD OFFICER (to be named), and Watch Commander CERVANTEZ were at all times relevant to this complaint employed as law enforcement officers for the Los Angeles Police Department.

7.    Defendant CITY OF LOS ANGELES is believed to be and thereon alleged to be a municipal corporation and a local public entity responsible for the misconduct of its employees, including employees of defendant City of Los Angeles' Police Department. Individual law enforcement defendants are hereinafter referred to by their names and/or their titles (officers, sergeants, law enforcement officers, etc.),

- 2 -

1  and any governmental entity defendants are referred to   by proper name or as

2  governmental entity.

3

4  **PRIVATE DEFENDANTS ACTING**
   **UNDER COLOR OF STATE LAW:**

5

6      8.      California Corporation Defendant McCARTY MEMORIAL

7  CHRISTIAN CHURCH ("MMCC"), Defendants LORENZO JOHNSON

8  ("JOHNSON") Chairman of MMCC's General Board, and Compensated Supervisory

9  Property Manager, GWENDOLYN ATKINS ("ATKINS") Secretary and

10  Compensated Property Manager of MMCC, JONATHAN PAGE ("PAGE") Deacon

11  and Compensated Property Manager of MMCC;  California Corporation Defendant

12  CHRISTIAN CHURCH (DISCIPLES OF CHRIST) PACIFIC SOUTHWEST

13  REGION ("PSWR"), PSWR is MMCC's Middle Adjudicator, Defendants BRUCE

14  INDERMILL ("INDERMILL"), is Senior Administrator of and Agent of Record for

15  PSWR, BRENDEN HENDRICKS ("HENDRICKS") is Assistant to Defendant

16  Indermill and Property manager for MMCC; California Corporation Defendant R&R

17  REMODELING, INC. ("R&R"), is a long-time construction vendor of MMCC and

18  PSWR, Defendant RAFAEL ADAN AYALA MARTINEZ ("MARTINEZ"), is the

19  Owner of, Agent of Record, for and Employee of R&R; California Company Jet

20  SPEED PLUMBING, INC. (DOING BUSINESS AS) RITZ PLUMBING ("RITZ"),

21  is a long-time construction vendor of MMCC and PSWR, Defendant REZA VANDI

22  (VANDI), is the Owner of and Agent of Record for Ritz, John/Jane Doe #1, Ritz

23  employee, John/Jane Doe #2, Ritz employee.

24

25      9. Plaintiff alleges the State officers conspired with the Private

26  employees/agents of the Private California corporations to deny Plaintiff her

27  constitutional rights under the First, Fourth and Fourteenth Amendments of the

28  United States Constitution and Article 1, section 1. of the California State

1  Constitution.  Plaintiff further alleges the Body Worn Cameras (BWC) footage of the

2  on-site Officers, will bear witness to the officers and the employees/agents of the

3  corporations, voluntary meeting of the minds.  The court after evaluating the actions

4  of the private California corporate employees pursuit to The Court's application of

5  the Threshold State Action Analysis, found the State officers and Private actors'

6  actions, to be state actions.

7      10.    Plaintiff allege the private California corporations' policies and

8  decisions violated Plaintiff's rights and each corporation failed to act under

9  circumstances, showing its deliberate indifference to Plaintiff's rights. Plaintiff

10 further allege that the violations of her constitutional rights were caused by the failure

11 of the private California corporations to train their employees/agents adequately.

12      11.    The defendants whose identities are still unknown are sued herein under

13 the names DOES 1 through10 (DOES). Plaintiff alleges only10 DOES because local

14 court rules so restrict the number of DOES a plaintiff may allege (seeL.R.19-1).

15 However, plaintiff is informed and believes and thereon alleges that there may be

16 more than 10 DOE defendants who are in some way responsible for the damages

17 caused to plaintiff as set forth below and hence, plaintiff reserves all of her rights to

18 seek redress against each and every person or entity, however many such DOE

19 defendants there are, that is/are responsible for causing plaintiff to suffer the damages

20 alleged below.

21      12.    The identities of the defendant DOES 1 through10 are unknown to

22 plaintiff. Plaintiff therefore sues defendant DOES 1 through 10 as fictitiously named

23 defendants. Plaintiff is informed and believes and thereon alleges that all DOES, 1

24 through 10, are responsible in some manner for the occurrences alleged herein and

25 that plaintiff's damages as alleged herein were proximately caused by such

26 occurrences. Accordingly, wherever" defendants," "officers,"" sergeant," a municipal

27 entity, corporate entity, corporate employee/agent or other similar term is used in this

28 pleading to refer to a defendant, such term is intended to include all DOE defendants.

1   Plaintiff will ask leave of this Court to amend this complaint to set forth the true

2   names and capacities of said DOE defendants when they have been ascertained.

3       13.    Plaintiff is informed and believes and thereon alleges that each

4   defendant was the agent and employee of each other defendant and was at all times

5   acting within the scope of such agency, and that each defendant is responsible in

6   some manner or respect, as alleged below, for plaintiff's injuries and the damages

7   caused to her.

8       14.    The Court has denied the Defendant Officers qualified immunity.

9       15.    Each and every allegation set forth in each and every averment of this

10  complaint is hereby incorporated by this reference in each and every other averment

11  and allegation of the complaint.

12      16.    Plaintiff was deprived of, inter alia, interests protected by the

13  Constitution or laws of the United States as well as the Constitution or laws of the

14  State of California, and defendants caused any such deprivations while acting in the

15  course and scope of their employment and under color of state law.

16      17.    Except as otherwise stated, all acts or omissions alleged to have been

17  engaged in by any defendant are alleged to have been engaged in with evil motive

18  and intent, and in callous, reckless, and wanton disregard of plaintiff's rights.

19

20                              **BACKGROUND**

21      18.    As set forth above, at all times relevant to this complaint and since

22  October of 1991, Plaintiff has lived -- and still does live – at the McCarty Memorial

23  Christian Church (MMCC ) apartments located at 2527 11th Avenue in the City of

24  Los Angeles. The MMCC sanctuary and education buildings are located elsewhere on

25  West Adams Blvd., but it has owned and been responsible for the building located at

26  2527 11th Avenue ever since plaintiff has lived there.

27      19.    In September of 1991, Mrs. Lacey, the then real estate agent/ property

28  manager for McCarty Memorial Christian Church's property, showed Plaintiff a

                                    - 5 -

1  rental that Mrs. Lacey referred to as "the Church's "2nd floor Granny Flat". The rental

2  offered a living room, two bedrooms, a kitchen, bathroom and a second landing built-

3  in window bench.  Plaintiff noticed and asked why each door leading into a room had

4  an outside lock requiring a key.  Mrs. Lacey explained that the house in furtherance

5  of the church's calling, once was used as a boarding house for people in recovery.

6  Plaintiff rented and moved into the commercially offered upstairs apartment, October

7  of 1991.

8      20.    The area, referred to as "the downstairs apartment", was rented and

9  occupied by the Allen-Harris-Jones family.  The Church's property although large

10  and impressive, suffered from decades of neglect.  The tenants collective offered the

11  church, at the tenants' expense; and with one of Mrs. Jones' brothers providing the

12  labor, to revive the interior aesthetics of the Church's property. The Church Board

13  enthusiastically accepted the tenants' offer and Mrs. Lacey praised the result.

14  Throughout the ensuing years, from time to time, upon Plaintiff paying for the needed

15  materials, Mrs. Jones' brother would provide the upkeep of Plaintiff's apartment as

16  he unconditionally did for his family's apartment.

17      21.    Upon Mrs. Lacey's retirement, Defendant Johnson assumed the duties of

18  property manager for the church property.  Over two decades later, the Church

19  installed Defendant Gwendolyn Atkins as Church Secretary as well as a compensated

20  property manager.  The Church also installed Defendant Jonathan Page and his

21  brother Ron, as compensated property managers.  Defendant Lorenzo Johnson, at that

22  time, was Chairman of the General Board and the Church's compensated Supervisor

23  Property Manager.

24

25      22.    Years later, Mrs. Jones' brother unexpectedly fell ill and passed away;

26  during the same time Mrs. Jones' stepfather, a tenant himself, was in the grip of

27  Alzheimer.  Plaintiff and Mrs. Jones recognizing neither had the skills to maintain

28  their apartment as her brother had done, turned therefore to MMCC with habitability

1    concerns needing addressing.    On one such occasion, Defendants Atkins announced:

2    "When it comes to repairs to the "parsonage", the Church policy is: the Church will

3    get to it, when we get to it."    Plaintiff alleges that was the first time she ever heard

4    the property housing the apartments referred to as the "parsonage."  Plaintiff

5    responded by insisting MMCC had a responsibility to its tenants to address housing

6    issues within a reasonable time, pointing out in her opinion, MMCC in the past, took

7    much too long to rid the property of rodents, after being told of Plaintiff's life-long

8    phobia of rodents.

9        23.    Defendant Atkins then stated: "The needs of the Church come first and if

10   you were a member of the Church, you would know that. Also, what you don't know

11   is the Church has the legal right to have faith members rent the parsonage over you,

12   so if you can't deal with the Church comes first, you can move." After talking it

13   over, Mrs. Jones and Plaintiff decided to request a meeting with the Church Board.

14       24.    Defendant Page was there, his brother Ron, each man MMCC allowed to

15   reside in the Church's Educational and Youth Building, next door to the Church

16   Sanctuary. Defendant Johnson was also there.  However, a Church Elder, whom

17   Plaintiff had never met, but the Church affiliates showed complete deference,

18   dominated the meeting, along with Defendant Page.  The Elder told the tenants, they

19   would just have to learn to "Make do" and ultimately stated, he agreed with

20   Defendant Page that maybe a church member renting the property, would be a better

21   fit for the church.

22       25.    After the meeting, Mrs. Jones and Plaintiff discussed this definite shift in

23   MMCC's attitude towards the tenants. They decided to resubmit the habitability

24   issues to MMCC; and going forward, give MMCC 30 days to act; except for rodent

25   infestation or something equally invasive.  If the repairs weren't addressed within 30

26   days, Plaintiff was to call the health department; which she did and continued to do;

27   in response to MMCC's policy of "The Church will get to it when we get to it."

28   MMCC subsequently change the tenants' lease to month to month.

## FACTS AND ALLEGATIONS
## COMMON TO ALL CAUSES OF ACTION

26.    In June of 20017, MMCC informed the tenants it had decided to sell the property housing the tenant's apartments. The tenants were given 60 days to vacate. Everyone began packing belongings for his or her move out.

27.    In early July of 2017, Plaintiff acting on behalf of both families went to Los Angeles Housing + Community Investment Department (HCIDLA), seeking emergency housing. Based on Plaintiff's answers to HCIDLA's intake document, Plaintiff was directed to request an investigation by Los Angeles Department of Building and Safety (LADBS).  The HCIDLA intake specialist informed Plaintiff the building at 2527 11th Avenue, was registered, as a single-family dwelling and Plaintiff's apartment might be illegal.

28.    Soon an inspector arrived from LADBS, and after conducting an investigation of the property at 2527 11th Avenue, Los Angeles California 90018, Assessor's Parcel NO: 5059-008-009, on July 10, 2017, by written report, LADBS notified MMCC and its tenants, that the occupancy or use of the property had been changed from a Single Family Dwelling to a Two Family Dwelling without obtaining the required Certificate of Occupancy.

29.    Plaintiff allege LADBS's investigation determined that, at some point before Plaintiff's tenancy, MMCC had unlawfully and without permission converted Plaintiff's residence into an unpermitted two-unit dwelling by adding a kitchenette upstairs. When Plaintiff moved in, she had no knowledge that the apartment had been improperly altered. LADBS determined that MMCC's unlawful and unpermitted conversion subjected the property to the City of Los Angeles' Rent Stabilization Ordinance ("LARSO"), which provided Plaintiff with certain protections as a tenant.

30.    Having determined that MMCC unlawfully converted and made alterations to the dwelling in which plaintiff was living, LADBS informed MMCC

[PROPOSED] FOURTH AMENDED COMPLAINT

that it was required to immediately obtain proper permitting for it as a two-unit

apartment rather than a single-family residence. In addition, HCIDLA informed

MMCC that it should rescind its notice to plaintiff to vacate because it was in

violation of the LARSO; that, for the time being and until remedied, MMCC was not

permitted to collect rent from plaintiff because the unit was not properly and legally

permitted; and that under controlling law, if MMCC sought to evict plaintiff, it was

required by the LARSO, before any eviction, to pay plaintiff (over twenty-thousand

dollars for) relocation assistance.

      31.    On August 14, 2017, Defendant Page, rescinded his notice to vacate that

he had issued plaintiff, but he did not obtain permits for the building as it had been

ordered to do. Plaintiff allege MMCC, its partners, assignees, successors,

representatives, managers, agents, attorneys, employees and all persons acting under

or in concert with MMCC, from August 5, 2017 onward, without legal authority,

denied and withheld from Plaintiff, the protections due her under LARSO.

Nevertheless, plaintiff mistakenly continued to pay her monthly rent of $900 to

MMCC for August and September of 2017.

      32.    On August 23, 2017, Defendant Deacon Page issued a 24-hour Notice to

Enter, pursuant to California Civil Code § 1954. The Notice stated:

> "You are hereby notified that on Thursday 24, 2017 at
> 10 a.m., the owner's intending to enter the premises
> identified above which you hold and occupy.  They need
> to stay one hour. The purpose for entry is to assess the
> violation(s)  issued by the City of Los Angeles Department
> of Building and Safety. This Notice was personally served
> or posted and mailed by Landlord at the following time:
> 1pm and date: 8/23/17
>
>       Signed by: Deacon Jonathan Page

33.    On Thursday August 24th, 2017 at 10:a.m. Plaintiff and her downstairs neighbor's adult child waited until almost noon for Jonathan Page.  Plaintiff and her neighbor's adult child both left to keep their individual appointments, sometime after noon.

34.    A little after 1pm, Plaintiff's downstairs neighbor called Plaintiff to say one of her brothers stopped by her apartment to visit with an out of town relative who was staying with her.  Defendants Page and Atkins arrived at the residence, insisting Plaintiff was upstairs and they were coming in.  The brother informed the Defendants, Plaintiff and his sister weren't home and he, the brother, didn't have the authority to allow them in.  Words were exchange, and Mr. Page and Ms. Atkins proceeded to call the police, alleging the brother threaten to kill them.  When the police arrived, no one was there.

35.    Later that afternoon, Plaintiff went to the Southwest Division of the Los Angeles Police Department and informed the Sergeant on duty that she and Mr. Page were in a housing dispute, and his false allegations arose from that. Plaintiff requested if there was a police report concerning the events of the day, she requested to have her statement included in the report. Plaintiff's thinking was such an allegation to a Police Officer as made by Defendants Page and Atkins could have foreseeable unnecessary reverberations. The Sergeant wouldn't confirm or deny such a report existed but declined to include Plaintiff's statement if one did exist. However, she agreed to Plaintiff's request to have a police officer come the next day to explain to Plaintiff and MMCC police department policy on civil disputes.

36.    Two Police Officers arrived the next day.  After listening to both sides separately, the lead officer explained to Plaintiff and Defendants Page and Atkins, absent the need to prevent crime or behavior that disturbs the peace, the policy for Los Angeles Police Department (LAPD) Officers shall be not to become unnecessarily involved in civil disputes.

[PROPOSED] FOURTH AMENDED COMPLAINT

**LAPD Manual Volume 1 Section 524 states:**

> "The presence of police officers at the scene of a civil dispute can
> have an intimating effect upon unsophisticated persons and
> is a tactic often employed by individuals and establishments
> seeking to avoid the more cumbersome civil process. The
> presence of officers at such scenes is primarily to preserve the
> peace and to prevent a crime from occurring. Officers shall not
> become unnecessarily involved in civil disputes It is the policy of the
> Los Angeles Police Department to dispatch a police unit to a civil
> dispute only in those cases where a crime has been reported or when
> it appears necessary to prevent criminal activity. Involvement by
> members of this Department shall be limited to preventing criminal
> activity and encouraging all parties to pursue appropriate civil remedies.
> Officers shall scrupulously avoid taking sides in any civil dispute or
> giving the appearance that this may be the case. Exceptions may be
> made in the event of a request for assistance by a governmental agency
> whose responsibilities include executing civil processes."

37.    The lead officer then asked Plaintiff if she would allow the Defendants
to enter her apartment to assess the violation(s) issued by LADBS. Plaintiff agreed;
the officers departed.

38.    The Defendants remained in Plaintiff's apartment for approximately
twenty minutes taking pictures and notes.  While there, Plaintiff asked Defendants
why would they large such a dangerous and erroneous police complaint.  The
Defendants didn't answer but with a thank you, soon left Plaintiff's apartment.

39.    Starting in October of 2017, plaintiff declined to pay rent to MMCC and
requested that MMCC refund her for the August and September rent she had paid in
error. She also requested from MMCC that it pay her the location assistance money

- 11 -

1  she was entitled to under the law if it was forcing her to move. MMCC refused to

2  refund plaintiff anything and refused to pay her any relocation assistance. MMCC

3  refused to register its property as a two-unit dwelling.  Further, MMCC claimed

4  plaintiff was in breach of her lease for not paying her October rent and, on November

5  1, 2017, MMCC filed an unlawful detainer action against plaintiff seeking to evict

6  her.

7      40.    During November of 2017, after filing its unlawful detainer against

8  plaintiff, MMCC personnel spoke with plaintiff about the situation. Basically,

9  MMCC personnel told plaintiff that they believed that if MMCC were able to remove

10 plaintiff's kitchen sink, the property would then be in compliance with all applicable

11 laws, would revert to being a single dwelling unit, no longer subject to the LARSO,

12 and as such, MMCC would not be required to abide by LARSO rules or pay plaintiff

13 relocation assistance. Plaintiff told MMCC personnel that she disagreed with them

14 about virtually everything and that she was not going to permit MMCC to remove her

15 kitchen sink.

16     41.    MMCC contacted LADBS, complaining of Plaintiff 's refusal to allow

17 their contractor to remove her kitchen sink.  LADBS explained it had no authority to

18 order Plaintiff to allow private parties into her home.  However, MMCC was told if

19 the failure to comply with the notice or order, or if the time for correction has expired

20 without correction of the violation(s), and it is determined the delay warrants a civil

21 action brought by the City Attorney and the tenant is found to be to the cause of the

22 violation to comply, the owner of the property wouldn't be held liable.

23

24     **LAMC SEC. 161.905. CIVIL PENALTIES AND FINES.**

25     **(Added by Ord. No. 173,011, Eff. 1/30/00.)**

26     **42.**    Any person or entity violating this article shall be liable for a civil fine

27 of up to $1,000 for each day the violation is committed or permitted to continue. The

28 fine shall be assessed and recovered in a civil action brought by the City Attorney in

- 12 -

[PROPOSED] FOURTH AMENDED COMPLAINT

1   any court of competent jurisdiction. There may be no more than one violation per

2   building per day. The Department shall also be entitled to the costs of enforcing this

3   article, pursuant to a court order. Any fine assessed and recovered in an action

4   brought pursuant to this paragraph shall be paid to the Department. The Department

5   shall have the authority to pursue any of the remedies, including fines or fees

6   authorized by California Health and Safety Code Sections 17980, 17980.6 through

7   17981, and 17992, and any other remedies provided by law.

8

9                            **LAMC SEC. 161.907**

10                    **(Added by Ord. No. 185,644, Eff. 7/6/18)**

11  No civil or criminal fine, penalty or cost shall be imposed for seeking pre-compliance

12  judicial review of an inspection.

13       43.    Both LADBS and HCIDLA investigations determined the Property at

14  2527 11th Avenue, Los Angeles, Parcel NO: 5059-008-009, did not fall within the

15  single–family dwelling exemption to the Rent Stabilization Ordinance of the City of

16  Los Angeles (Ordinance). (§151.00 et seq.)  Under the relevant definitions of section

17  12.03 (incorporated by reference into the Ordinance), the exemption applies to a

18  "detached dwelling containing only one dwelling unit," a "dwelling unit" being

19  defined as "two or more rooms, one of which is a kitchen, designed for occupancy by

20  one family for living and sleeping purposes. "A "family" means "[o]ne or more

21  persons living together in a dwelling unit, with common access to, and common use

22  of all living, kitchen, and eating areas within the dwelling unit."  The California

23  Court of Appeal held that regardless of the original design and use of the Property, it

24  is the current configuration and use that determines exemption.  In this instance,

25  MMCC's property has two separate apartments, rented to two separate households,

26  who alone have exclusive access to and use of their rooms.

27       44.    Therefore, the property does not qualify for the single–family dwelling

28  exemption from the Ordinance, because it is not a "detached dwelling containing only

1  one dwelling unit" within the meaning of section 12.03. *See Chun v. Del Cid (2019)*

2  *Cal.App.5th, 2019 WL 187291325.*

3       45.    HCIDLA informed MMCC's that its stated purpose of selling the

4  property is/was not a legally permitted reason for eviction of its tenants under

5  LARSO.

6       46.    However, HCIDLA explained under section 151.09(A), Subdivision 11,

7  of the LARSO, a landlord of a rent controlled property may bring an action to recover

8  possession of a rental unit if, "the landlord seeks in good faith to recover possession

9  of the rental unit in order to comply with a governmental agency's order to vacate the

10  building housing the rental unit as a result of a violation of the Los Angeles

11  Municipal Code or any other provision of law." (LA Mun. Code §151.09(A)(11));

12  but, when a landlord evicts under this section, the landlord also must pay relocation

13  fees. (LA Mun. Code §151.09(G)). This means that even if there is also another

14  reason for eviction (non-payment of rent for example), if one of the reasons fall under

15  this section, the landlord must pay the relocation assistance.

16       47.    LADBS' order to "Provide, repair, or replace the required heating in all

17  interior spaces intended for human occupancy to be capable of maintaining a

18  minimum indoor temperature off 68 degrees at a point 3 feet above the floor", as well

19  as the age of the structure in which Plaintiff resides, indicating the real possibility of

20  lead paint and asbestos being disturbed upon the removal of Plaintiff's kitchen sink,

21  requiring MMCC to submit a Tenant Habitability Plan to HCIDLA.

22

23       **"Tenant Habitability Plan**. A document, submitted by a

24       landlord to the Department, identifying any impact Primary

25       Renovation Work and Related Work will have on the

26       habitability of a tenant's permanent place of residence and the

27       steps the landlord will take to mitigate the impact on the tenant

28       and the tenant's personal property during the period Primary

Renovation Work and Related Work are undertaken. **(Added
by Ord. No. 176,544, Eff. 5/2/05.)"**

48.    Additionally, HCIDLA explained to MMCC the court's ruling in Salazar
v. Maradega, 10 Cal. App. 4th Supp. 1, 3, 12 Cal. Rptr. 2d 676, 677 (Cal. App. Dep't
Super. Ct. 1992, in which, a landlord attempted to regain possession of a non-
conforming garage unit after the tenant stopped paying rent. The California Court
held:

> (1). A landlord evicting a tenant due to non-conformity falls
> under section 151.09(A), Subdivision 1, of the Los Angeles
> Rent Stabilization Ordinance, in which, the court found that the
> landlord must pay relocation fees in order to regain possession
> of that unit, even though the lease was void and unenforceable
> and the landlord was unable to collect any rent on an illegal
> apartment

> (2). California law allows a tenant housed in an illegal unit to
> retain legal possession of the dwelling unless and until receipt
> of relocation assistance.

49.    HCIDLA's August 4, 2017, notice to MMCC and its tenants further
explained, depending on the tenancy, the relocation amount can range from $8,050 -
$20, 050.  Its noticed continued to explain, under the RSO section 151.05, landlords
may not demand or accept rent without first paying annual registration fees for their
rental units and obtaining a valid rental registration from HCIDLA.

50.    MMCC never obtained a valid rental registration from HCIDLA,
therefore, was unable to post/and or serve its tenants the Certificate of Registration as
required by LAMC section 151.05(A).  HCIDLA further explained, if or when under
the existing circumstance, a landlord chose to evict, he/she must either pay relocation

- 15 -

1  directly to the tenant or deposit it in a escrow account with escrow instructions to the
2  tenant within 15 days of the date on the notice of eviction.

3      51.   Plaintiff later found out, there is no private right of action to enforce
4  LAPD's order.

5      52.   In late July 2019 Defendant Bruce Indermill who self-identified as
6  Christian Church (Disciples of Christ) Pacific Southwest Region's (PSWR) decision-
7  maker when it came to secular issues, asked for a face to face meeting with Plaintiff
8  and Mrs. Jones.

9      53.  It was at that meeting Defendant Indermill admitted to being the
10  "someone" Defendant Atkins referenced as "telling us what to do" in October of
11  2017. Defendant Indermill stated before joining PSWR, he had been a property
12  manager for an apartment complex, therefore he knew rental laws and based on his
13  knowledge, MMCC's tenants weren't entitled to relocation assistance. In late
14  September or early October of 20018, Defendant Indermill took over from Defendant
15  Hendricks, in the position of compensated property manager of MMCC's apartments
16  on PSWR's behalf.  Defendant Indermill offered Plaintiff and Mrs. Jones a buyout
17  agreement offering less than the statutory amount of required by LAMC, in violation
18  of LAMC 151.31 as. required by law.

19      54.   Plaintiff is informed and believes and thereon alleges that MMCC's
20  unlawful detainer action against her was without merit and that MMCC filed it and
21  litigated it to harass her, but more importantly Plaintiff allege, to create a narrative for
22  the police as the Police officers Body Worn Camera (BWC) footage Plaintiff received
23  on November 2021 bears out.   In April of 2018, without ever obtaining any of the
24  relief it sought, MMCC requested the dismissal of its unlawful detainer action against
25  Plaintiff, and it was, in fact, dismissed.

26  ///

27  ///

28  ///

**POLICE SERVICE REPRESENTATIVE (PSR)**

**POLICE DISPATCHERS**

**CIVIL DISPUTE**

**LANDLORD/TENANT**

**OFFICIALLY PROMULGATED POLICY**

55.    "A landlord-tenant relationship is primarily based on property rights. When criminal violations are present and/or a need to keep the peace, a field unit shall be dispatched to the scene of a landlord-tenant dispute.  Callers with a landlord-tenant dispute that does not meet the criteria for dispatch are to be referred to the civil process, such as a private attorney and or an appropriate agency. Refer the caller to the Los Angeles County Sheriff's Department for inquiries on eviction enforcement, property rights, and long-term agreements. For inquiries related to City housing refer the caller to County District Environmental Service for Apartment Habitability.

56.    Criminal conduct by a landlord includes but is not limited to the following circumstances: A tenant lockout without lawful court-ordered eviction; seizure of doors or windows of a tenant's residence in an attempt to render the apartment uninhabitable; terminating utility services to force a tenant to move; a landlord trespassing by entering a tenant's apartment arbitrarily at an unreasonable time for an unreasonable purpose.  Criminal conduct by a tenant may include, but is not limited to, the following circumstances: vandalism; attempting to return and take possession of an apartment after a lawful eviction; disturbance of the peace."

Police Service Representative

Manual Volume 111, Section 330.

///

///

[PROPOSED] FOURTH AMENDED COMPLAINT

**FIRST INCIDENT**

## DEFENDANTS' UNLAWFUL AND UNREASONABLE SEARCHES & SEIZURES

57.   On November 30, 2017, Los Angeles Police Department officers Simmons and Kopacek came to plaintiff's apartment at the wishes of MMCC personnel and Defendant Martinez.  Defendants Johnson, Atkins and Page comprised the MMCC personnel and they with Defendant Martinez, set upon defaming Plaintiff to the officers, stating Plaintiff hadn't paid her rent in months, (although the Private Defendants knew they weren't entitled to rent), that Plaintiff installed the kitchen herself, (although the Private Defendants offered no evidence of this fraud), that she hired an ambulance chaser for a lawyer to fight the Church's eviction of her (although the law prevented Plaintiff from being evicted), that LADBS was leavening fees and fines against the Church because the kitchen was of yet, not dismantled (once again without offering any evidence of fees and fines being leaven).  The Church Defendants needed to demonize plaintiff, in order to gain the Officers assistance in their illegal enterprise.  The Church Defendants were successful.

58.   The Defendants Officers Simmons and Kopacek never questioned the truthfulness of any of the Defendants' allegations.   Officers Simmons and Kopacek upon hearing from Defendants Johnson and Martinez that Plaintiff was only a tenant and had no affiliation or association with the Church, set about doing the Church's bidding.  So taken with the Church's plight as described to the Defendant officers by the Church Defendants, that even after being told by Defendant Martinez that the Church Defendants couldn't find their copy of the 24- hour notice to enter, that was served on Plaintiff the day before, in violation of California Penal Code 134, the officers, accepted Defendants Johnson, Martinez, Atkins and Page mocked up replica. and used the mockup as the original in their legal investigation of questioning Plaintiff's neighbor and questioning Plaintiff.  The officers unquestioned belief in the

1    Church Defendants libelous statements, would eventually lead to the officers seizing

2    Plaintiff, taking away her freedom.

3        59.    Initially, the officers requested that plaintiff allow MMCC personnel and

4    others to enter plaintiff's apartment so they could remove her kitchen sink and/or do

5    other alterations. Plaintiff refused. She explained to the officers that there was a then-

6    pending unlawful detainer action that MMCC had filed against her and that they were

7    not allowed to enter her unit without a warrant or some other lawful authority. The

8    officers, however, did not have any type of warrant or any other lawful basis to make

9    entry: plaintiff did not consent -- indeed she objected to their entry; there was no

10   emergency; plaintiff hadn't moved out; and there were no repairs that had to promptly

11   be made, or that had been agreed-to by plaintiff. Plaintiff further explained she didn't

12   owe any rent and the Defendants knew that to be true.

13       60.    Despite Plaintiff's unrelenting insistence that all matters dealing with the

14   timing and manner of Plaintiff's kitchen being dismantled was also before the Court,

15   Officers Simmons and Kopacek fervently disagreed.  The Officers insisted that the

16   eviction's action purpose was only to decide if Plaintiff paid her rent, and if not, to

17   issue a ruling to evict.  Officer Simmons admitted she knew nothing of California or

18   Los Angeles Landlord-Tenant housing laws and she and Officer Kopacek relied on

19   the information provided by the Defendants.  Officer Simmons wouldn't allow

20   Plaintiff to close and lock her entry door and ordered Officer Kopacek to stand in

21   front the door to prevent Plaintiff from locking it; an order he followed for many

22   hours, Plaintiff knew she was seized.

23       61.    Eventually defendant Sgt. NORWOOD arrived at the location. Plaintiff

24   is informed and believes and there on alleges that defendant Sgt. Norwood was a

25   supervisor of officers Simmons and Kopacek.  Officer Simmons told Sgt. Norwood

26   she seized Plaintiff and Sgt. Norwood did nothing to countermand that order.  After

27   she spoke with the officers and MMCC personnel, Defendant Sgt. Norwood

28   addressed plaintiff, Plaintiff told Sgt. Norwood everything she told Officers Simmons

- 19 -

1    and Kopacek. Sgt. Norwood agreed with her officers, that Plaintiff's upcoming court

2    date with the Defendants, only had to do with the eviction. Plaintiff realized Sgt.

3    Norwood also wasn't versed in California and/or Los Angeles Landlord-Tenant

4    housing Laws. Sgt. Norwood told Plaintiff, over plaintiff's objections, she (Sgt.

5    Nowood) was giving the Church Defendants her permission to enter Plaintiff's

6    apartment. Defendant Sgt. Norwood told plaintiff that if she interfered in any way

7    with their entry or work while they were inside, she would be arrested. Then

8    defendant Sgt. Norwood, over plaintiff's objection, informed MMCC and the

9    construction person that they could enter plaintiff's apartment.

10        62.    Plaintiff was frightened and intimidated. Although she certainly didn't

11   want anyone coming into her home, she was overwhelmed with the fear of being

12   arrested. Plaintiff watched in fear, humiliation, embarrassment, anxiety and sadness

13   as, pursuant to defendant Sgt. Norwood's instructions, the MMCC and construction

14   persons streamed into her apartment, with the protective Sgt. Norwood and Officers

15   Simmons and Kopaeck.  Once they were inside, MMCC and construction personnel

16   began moving and removing items from plaintiff's kitchen and commencing

17   construction work. Plaintiff attempted to intervene by reminding Defendants Johnson

18   and Martinez of their legal obligation not to engage in construction until they

19   submitted and gain approval from HCIDLA of the required Tenant Habitability Plan.

20        63.    Defendant Sgt. Norwood insisted Plaintiff prove to her such a

21   program existed.  When Plaintiff asked Sgt. Norwood to stay the construction work

22   until she could retrieve her computer to show her on the computer the program

23   existed, Sgt. NORWOOD stated she wasn't interested in looking at a web page and

24   gave the private Defendants permission to continue the construction.  Eventually Sgt.

25   Norwood, and Officers Simmons, and Kopacek then left from the location, Sgt.

26   Norwood telling plaintiff before she did that she would "be back if it were

27   necessary". Plaintiff understood defendant Sgt. Norwood's statement to her as an

28   order that she let the MMCC and construction personnel do anything they wanted for

1  as long as they wanted, lest she be arrested.

2       64.    MMCC and construction personnel remained inside plaintiff's apartment

3  for several more hours moving her personal items and making alterations, including

4  but not limited to removing her kitchen sink which resulted in large holes in her

5  kitchen wall being left open to the outside, serving as the beginning of rats and other

6  vermin making their way through the holes, infesting Plaintiff's apartment and that of

7  her downstairs neighbor's, lasting over six months with the knowledge of Defendants

8  Johnson, Martinez, Atkins, Page and The County Health Department.

9       65.    Intermittently, and out of policy, Police officers continued to be

10  dispatched to Plaintiff's home between December 1, 2017 and January 31, 2018 at

11  the request of the Church Defendants.

12

13  **B. SECOND INCIDENT**

14  For the sake of brevity, Plaintiff quotes from

15  the Magistrate's Report and Recommendation

16  pages 11-16

17                31.    DEFENDANTS' UNLAWFUL AND UNREASONABLE

18                       SEARCHES & SEIZURES, PAINTIFF'S FALSE

19                       ARREST AND ILLEGAL DETENTION, SPECIAL

20                       RELATIONSHIP AND STATE CREATED DANGER

21

22       66.    On February 1, 2018, Los Angeles Police Department Officers Smith

23  and Maldonado came to Plaintiff's apartment, first speaking with MMCC personnel.

24  (MMCC personnel was Defendants Atkins and Hendricks), MMCC told the officers

25  they put a 24-hour notice on Plaintiff's residence to do some work but Plaintiff

26  deadbolted the door and they had to call a locksmith to enter; MMCC also tells the

27  officers the police have been called out several times for civil standbys. Officers

28  spoke with Plaintiff, who was in tears.  Plaintiff told the officers that it does not

1  matter that the MMCC personnel who entered her house worked for the owner of the

2  building; Officer Smith told Plaintiff it does matter and asked if Plaintiff received the

3  24-hour notice. Plaintiff told the officers she and MMCC are in court and MMCC is

4  trying to circumvent the court. Officer Smith told Plaintiff that MMCC has legal right

5  to come in if they post 24-hour notice. The officers asked Plaintiff to provide

6  documentation that the court had ordered MMCC not to make the repairs, but

7  Plaintiff could not. Plaintiff asked if the MMCC personnel had any paperwork to

8  prove MMCC had a right to enter, and for the officers to call the judge; Officer Smith

9  told Plaintiff he was not going to call the judge. A neighbor explained to Officer

10  Smith that MMCC has been harassing Plaintiff constantly, and that she had tried to

11  contact Officer Aceves, who was familiar with the situation and the neighborhood.

12  Officer Smith replied that MMCC, as owners, had legal right to be at the property and

13  to enter if the provided 24-hour notice. The neighbor told him MMCC had done a lot

14  of shady stuff, including trying to break in, and that she had not seen them leave any

15  paperwork. Plaintiff, still upset, told Officer Smith that the officers do not believe

16  what MMCC has been doing or that she is in court with MMCC. She asked Officer

17  Smith if he would be upset if strangers had entered his home, and Officer Smith

18  replied that the MMCC personnel were not strangers, but owners of the building.

19  Plaintiff responded that she had never seen the MMCC individual before, until she

20  came downstairs and he was in her house, which frightened her.

21    67.    Officer Smith asked Plaintiff why she was upset about MMCC trying to

22  fix her plumbing, and Plaintiff explained that there was no issue with her plumbing

23  and that the court ordered them not to fix anything until the next court date. MMCC

24  personnel told the officers they posted a 24-hour notice of entry the day before and

25  explain that they had removed Plaintiff's upstairs kitchen but had left pipes and a gas

26  line sticking out that the City wanted removed. MMCC personnel confirmed they are

27  in litigation with Plaintiff but explained that there was no restraining order in place

28  preventing them from being "at the house." MMCC personnel also showed the

officers paperwork from the City "ordering" MMCC to make the repairs. MMCC personnel also told the officers Plaintiff had stopped paying her rent and that they were trying to evict Plaintiff but could not get a trial date. They told Officer Smith this issue had nothing to do with the eviction. MMCC gave the officers paperwork given to MMCC in July of the previous year, which detailed the items MMCC had to fix in Plaintiff's residence; MMCC had been unable to fix anything because Plaintiff refused to allow MMCC access. Officer Smith said, "if it were up to me, I have no issue with you guys going in and taking care of what you need to care of."

68.     The officers' supervisor, Sergeant Blocker, arrived and the officers explained that MMCC owned the property and needed make repairs, Plaintiff had not paid rent, MMCC had started the eviction process, and MMCC expected to go to trial. Officer Smith also told Blocker that there was "an issue with the plumbing" and that MMCC had posted a 24-hour notice of entry to address a number of violations cited by the City. He mentioned that Plaintiff was "completely 415, irate," and wasn't "listening to anything [he was] saying." Officer Smith told Blocker that Plaintiff claimed a court order prevented MMCC from entering the property but could not produce supporting documentation. He explained that Plaintiff had a concerned neighbor who told him that MMCC had been "messing with" Plaintiff, but also noted Plaintiff was "obviously not paying her rent" and "something was going on." Blocker said "well, they can go in anyway, we'll stand by, but not until [the plumber arrives]." Officer Smith explained that MMCC had a picture of the notice on the door, and that they said they left it at 10 a.m., but that the photo was not timestamped. Officer Smith said he "tend[ed] to believe" MMCC.

69.     Plaintiff's neighbor explained she had lived in the area for eight years and noticed MMCC harassing Plaintiff. For example, on a recent occasion, MMCC had watched and waited for the police to leave before going into the backyard. Officer Smith began "you got to understand [MMCC's] frustrations too, they are renting a house to someone who is not paying rent, essentially living here for

1  free...would you be upset if you owned a building and didn't get paid rent?" The

2  neighbor said that she would have stopped paying rent in Plaintiff's situation. He

3  further explained that MMCC had paperwork, where Plaintiff did not, and that if

4  Plaintiff had a court order showing MMCC was not allowed to make the repairs, he

5  would not let them enter. The neighbor told Officer Smith that she encouraged

6  Plaintiff to file suit for trespassing; Officer Smith responded that Plaintiff could not

7  file for trespassing because MMCC owns the property. He continued to explain that

8  landlords could enter "whether [the tenant] likes it or not," so long as they provided

9  24 hours' notice. "By law," he said, "all they need is 24 hours' notice."

10       70.      Plaintiff explained to Blocker that what MMCC said was not the law,

11  but that the officers were saying "with [their] badge and [their] gun" that MMCC is

12  the law. She emphasized that there were no repairs to be made, and that the judge was

13  going to decide everything on the next court date. She reiterated that she would not

14  allow MMCC in, and that the officers had no authority to allow MMCC in. Officer

15  Smith told Plaintiff's neighbors: "[MMCC] has all heir ducks in the line, they're

16  going go in today. I don't want us to take [Plaintiff] to jail. She's on the line of...on

17  the verge of going to jail." He encouraged Plaintiff's neighbors to talk her down and

18  said, "we'll break the door down if we have to." He reiterated twice that he didn't

19  "want to see this escalate to the point where [Plaintiff] has to go to jail," and stated

20  once that "[MMCC] can smash the door if they have to." Blocker told the officers and

21  Plaintiff's neighbor that MMCC "has the right" to make repairs and that the officers

22  will return later when the plumber arrives. Officer Smith told MMCC personnel that

23  they had the right to bust the door down or do whatever they have to in order to get

24  inside, and that they would return to standby and take Plaintiff to jail if she violates

25  the law in any way.

26       71.      Around 3:00 p.m., Officers Smith and Maldonado returned and spoke

27  with Plaintiff, who told them to speak with Defendant Norwood. Officer Smith

28  contacted Norwood, who tells the officers there is an ongoing lawsuit between

1  MMCC and Plaintiff, and that, according to the lawsuit, Plaintiff claims MMCC

2  needs to evict Plaintiff before making any repairs. Norwood gave the officers the

3  phone number for Plaintiff's attorney. Officer Smith spoke with MMCC who gave

4  Officer Smith documentation from their lawyer. Officer Smith told his supervisor he

5  contacted his "SLO" who is not aware of any court order preventing MMCC from

6  entering. The officers reviewed MMCC's documents, concluding that Plaintiff was

7  preventing MMCC from making repairs so that she could continue staying at the

8  property without paying rent. They then told MMCC they had the right to enter to do

9  the repairs. After calling an additional unit, the officers discussed their plan, which

10 involved taking down the door and going "hands on," if necessary.

11       72.     Officer Smith reiterated to other officers that MMCC was going in no

12 matter what" but that they were only there to make sure Plaintiff does not assault

13 MMCC. Blocker contacted and spoke with Plaintiff's attorney. At some point, he told

14 the attorney MMCC is not removing "any walls or kitchens" and that "if [Plaintiff]

15 wants to sue, that is totally up to her, I have no issue with that, that is not up to me."

16 The officers told MMCC they could enter to make repairs but could not remove any

17 walls, kitchens, or toilets. Plaintiff posted a note on her door stating the reader did not

18 have her permission to enter and leaving contact information for Plaintiff's lawyer.

19 Still, the officers entered the property with MMCC personnel. The officers stood in

20 Plaintiff's living space while MMCC worked. Plaintiff alleges the officers contacted

21 and got the approval from Norwood to enter into Plaintiff's apartment. Again, the

22 officers had no warrant, there was no emergency, and Plaintiff did not consent. The

23 construction crew removed more of Plaintiff's kitchen, making the holes in Plaintiff's

24 kitchen larger.  Plaintiff wanted to leave but was not permitted to by the Officer

25 Defendants. Plaintiff had not done anything illegal."

26       73.     Defendants and DOES' unlawful conduct described above caused

27 plaintiff to suffer enormous humiliation, embarrassment, fear, anxiety, emotional

28

1    distress, and Plaintiff alleges the stress from the noted events even manifested in her

2    suffering medical problems.

3

4                        **FIRST CAUSE OF ACTION**

5                        (Violation of Civil Rights: Conspiracy on behalf of plaintiff as

6    against  defendants Sgt. Norwood, Officers Simmons and Kopacek, Defendants

7    Johnson, Martinez, Atkins and Page, McCarty Memorial Christian Church, Christian

8    Church (Disciples of Christ) Pacific Southwest Region, R&r Remodeling, Inc., Jet

9    Speed Plumbing (Doing Business As) Ritz Plumbing, Sgt. Blocker, Officers Smith,

10    Martinez, Aceves, Carlos Maldonado, Robert Maldonado, Richardson, Defendants

11    Atkins and Hendricks Ritz, Ritz Doe employee#1, Ritz employee #2.  Officer Smith's

12    Senior Lead Officer (to be named).  Sgt. Norwood Watch Commander Cervantes, at

13    all times knew of the plan but as Senior Officers did nothing to stop it.

14                        (U.S.C.§1983)

15    **FIRST INCIDENT:**

16

17        74.    Plaintiff realleges and incorporates paragraphs 1-73.

18    On November 30, 2017 during a meeting between Defendants Sgt. Norwood and

19    Officers Simmons and Kopacek, Defendants Johnson, Martinez, Atkins and Page,

20    each agreed with the other to enter Plaintiff's home without a warrant, emergency or

21    her consent, but under the threat of her arrest if Plaintiff interfered with the entry or

22    construction work of Defendants Johnson, Martinez, Atkins and Page, in violation of

23    Plaintiff's constitutional rights under the Fourth Amendment of the U.S. constitution

24    and Article1, Section 1 of the California State Constitution.  The aforementioned

25    Defendants did in fact enter Plaintiff's apartment without warrant, emergency or her

26    consent, but under the threat of her arrest if plaintiff interfered with the entry or

27    construction work of Defendants Johnson, Martinez, Atkins and Page, in violation of

28

Plaintiff's constitutional rights under the Fourth Amendment of the U.S. constitution and Article1, Section 1 of the California State Constitution.

**SECOND INCIDENT:**

75.    On February 1, 2018, after police backup and MMCC's Plumbers John Does Ritz #1 and 2 arrival to Plaintiff's home, Sgt. John Blocker stood before the assembled 8-10 Defendant Police Officers.  He explained the plan to the officers and to Defendants Atkins and Hendricks, which involved taking down the door and going "hands on," if necessary.  Officer Smith reiterated to the other officers that MMCC was going in "no matter what", but they were only there to make sure Plaintiff didn't assault MMCC.  Each named Defendant knew and agreed to execute the plan as laid out by Sgt. Blocker.  Sgt. Blocker and Officers Smith, Martinez, Aceves, Carlos Maldonado, Robert Maldonado, Richarson, Defendants Atkins and Hendricks, each knowing there was no warrant, emergency or consent did enter Plaintiff's home, investigating every room of the two apartments, opening every closed or locked door, with at least two officers executing this procedure with guns drawn.  Officer Smith's Senior Lead Officer (to be named), Sgt. Norwood and Watch Commander Cervantes, knew of this impeding action but as senior officers, did nothing to prevent it. In violation of Plaintiff's constitutional rights under the Fourth Amendment of the U.S. constitution and Article1, Section 1 of the California State Constitution.

**SECOND CAUSE OF ACTION**

(Violation of Civil Rights: Unlawful and Unreasonable Search and Seizure

on behalf of plaintiff as against all defendants and Does 1-10)

(4th /U.S.C.§1983)

76.    Plaintiff realleges and incorporates paragraphs 1-73.

77.    By doing the acts described in paragraphs 57-73, all defendants and

DOES are alleged to have caused and/or permitted the violation of plaintiff's Fourth

Amendment right to be free from unreasonable searches and seizures, thereby

entitling plaintiff to recover damages pursuant to 42U.S.C.§ 1983.

### THIRD CAUSE OF ACTION

(Violation of Civil Rights: Substantive and Procedural Due Process

on behalf of plaintiff as against all defendants and Does 1-10)

(14th /U.S.C.§1983)

**78.**    Plaintiff realleges and incorporates paragraphs 1-73.  By doing the acts

described in paragraphs 57-73, all defendants and DOES are alleged to have caused

and/or permitted the violation of plaintiff's Fourteenth Amendment right to

Substantive and Procedural Due Process by entitling plaintiff to recover damages

pursuant to 42 U.S.C.§ 1983

### FOURTH CAUSE OF ACTION

(Violation of Civil Rights: Supervisory Liability on behalf of plaintiff as

against The City of Los Angeles, Sgts. Robin Simmons, Tiffany Norwood and

John Blocker, officer's Smith SLO, Watch Commander Cervantes), McCarty

Memorial Christian Church, Lorenzo Johnson, Christian Church (disciples of Christ),

Pacific Southwest Region, Bruce Indermill, R&R remodeling, Inc., Rafael Adan

Ayala Martinez, Jet Speed Plumbing, Inc. (doing Business As) Ritz Plumbing.

(U.S.C.§1983)

79.    Plaintiff realleges and incorporates paragraphs 1-73.

Plaintiff is informed and believes and there on alleges that defendant Sgts. Norwood,

Simmons, Blocker are supervisors within the Los Angeles Police Department, that

Lorenzo Johnson is President of MMCC, Bruce Indermill is PSWR's Executive in

Charge of Secular Issues, Rafael Adan Ayala is the owner of R&R Remodeling, Inc.

and Reza Vandi is the Owner of Jet Speed Plumbing, Inc. (dba) Ritz Plumbing and thereby sets an example to and directs other lower-level employees. Plaintiff is further informed and believes and thereon alleges that none of the defendant officers, or the corporate employees including in particular Sgts. Norwood, Simmons and Blocker, Defendants Johnson, Martinez, Indermill, Vandi  were disciplined or sanctioned by the CITY OF LOS ANGELES, its Police Department, or the Corporations they worked for their tolerance , participation and directing their subordinate to violate a Plaintiff's constitutional rights as was done as described herein.  Nor did they notify their subordinates they were in violation of CITY policy or practice or the each Company's policy or practice.  Rather, plaintiff is informed and believes and thereon alleges that the CITY OF LOS ANGELES and its Police Department and the Companies accepted and condoned all of the defendant officers' and their employees/agents' conduct described herein, and in particular, that of defendant Sgts. Norwood, Simmons, Blocker and Defendants Johnson, Martinez, Indermill and Vandi.

80.    Plaintiff is informed and believes and thereon alleges that, by allowing and condoning the acts, or fostering an atmosphere wherein the acts described above in paragraphs 8-29 are accepted and tolerated, defendant CITY OF LOS ANGELES, DOES  and The Named Company Defendants are alleged to have facilitated, maintained or permitted an official policy or custom of permitting, with deliberate indifference, the occurrence of the types of wrongs set forth herein above. Among defendant CITY OF LOS ANGELES, DOES and Named Company Defendants other wrongful policies and practices, it is alleged to permit unreasonable searches and seizures and turning a blind eye to its supervisors purposely leading and directing their subordinate to violate a Plaintiff's constitutional rights like the ones described in this complaint by failing to adequately and properly monitor and investigate allegations of police officer misconduct, and the misconduct of each company's employee/ agent and properly and adequately discipline officers  and

company emplyees/agents found, or who should have been found, to have committed
misconduct, thereby expressly or implicitly messaging to law enforcement and
Company personnel that conduct such as described herein is acceptable and within
CITY OF LOS ANGELES and each Company's policy and/or practice.

81.    Plaintiff, in sum, is informed and believes and thereon alleges that the
defendant officers' conduct as described herein as well as those of the named
Company Defendants was pursuant to and in conformity with CITY OF LOS
ANGELES' policy and practice and each company's own.. See Leev. City of Los
Angeles, 250 F.3d 668, 682-83 (9"t Cir.2001) citing and quoting Karim- Panahi v.
Los Angeles Police Dept, 839 F.2d 621,624 (9thCir.1988) (Monell policy practice
claim filed under 42 U.S.C.§ 1983 will withstand a motion to dismiss "even if the
claim is based on nothing more than a bare allegation that the individual officers'
conduct conformed to official policy, custom, or practice")

## FIFTH CAUSE OF ACTION

82.    (Violation of Civil Rights: Special Relationship, State Created Danger,
false arrest and false imprisonment on behalf of plaintiff as against Sgt. John Blocker)
(U.S.C.§1983)

Plaintiff realleges and incorporates paragraphs 1-73.

By doing the acts described in paragraphs 71-72, Sgt. Blocker falsely arrested
and falsely imprisoned Plaintiff.  Therefore, rendering Plaintiff helpless to monitor
the construction workers, and preventing them from enlarging the holes in her
exterior wall, which allowed more rats to enter her apartment and that of her
downstairs neighbors, adding to plaintiff's anxiety and fears.   Plaintiff alleges when
Sgt. Blocker promised Plaintiff and Plaintiff's lawyer he wouldn't let MMCC remove
"any walls or kitchens", he created both a special relationship with Plaintiff and by
not keeping that promise, a state created danger. Sgt. Blocker never monitor or

1  assign someone to monitor the construction workers. Sgt. Blocker never inspected
2  their work before leaving.
3
4                          **SIXTH CAUSE OF ACTION**
5        (Violation of Civil Rights: Monell Claim, Officially Promulgated Policy,
6        Failure To Train on behalf of plaintiff as against The City of Los Angeles)
7                              (U.S.C.§1983)
8
   83.    Plaintiff realleges and incorporates paragraphs 1-73.
9
   Based on the principles set forth in Monell v. New York City Department of
10  Social Services, 436 U.S.658 (1978), it is alleged that defendant City of Los Angeles,
11  California Corporation Defendant McCarty Memorial Christian Church, California
12  Corporation Defendant Christian Church (Disciples of Christ) Pacific Southwest
13  Region, California Corporation Defendant R&R Remodeling, Inc., AND California
14  Company Jet Speed Plumbing, Inc. (Doing Business As) Ritz Plumbing and DOES
15  are liable for all the damages caused to and injuries sustained by plaintiff as a result
16  of the conduct of any and all of the individual defendant officers, private actors, and
17  DOES.
18
19                     **FORMAL GOVERMENTAL POLICY**
20                     POLICE CONTACTS WITH CLERGY
21                     OFFICIALLY PROMULUGATED POLICY
22
   84.    "Constitutional guarantees of religious freedom have traditionally been
23  viewed as giving a unique status to houses of worship. Religious leaders (bishops,
24  ministers, pastors, priest, rabbis, and others designated as leaders of congregations)
25  are revered as keepers of religious discipline, teachers, counselors and symbols, of
26  religious faith. Because of this, police action should be consistent with the special
27  esteem in which houses of worship and religious leaders are held. Nevertheless, if
28

1   circumstances require police action, it should be noted that a house of worship is not

2   a sanctuary to be used to harbor law violators."

3                                       LAPD Law Enforcement Operations Policy Manual

4                                       Volume 1 Section 554 (1/554)

5

6       85.    Plaintiff alleges The City of Los Angeles' official promulgated policy,

7   dictates its police officers and those acting under the color of state law, show keepers

8   of religious discipline reverence and their actions toward them to be consistent with

9   the special esteem in which house of worship and religious leaders are held, is

10  unconstitutionally vague. The City of Los Angeles' policy of conferring unique status

11  to houses of worship, gave license to and provided support of its officers violation of

12  Plaintiff's rights under the First, Fourth and Fourteenth Amendment of the United

13  States Constitution, as well as Article1 section 1 of the California State Constitution.

14

15      86.    The City of Los Angeles policy offers its officers no guidance or any

16  restrictions in terms what it may or may not employ, while executing its policy that

17  its officers "should be consistent with the special esteem in which houses of worship

18  and religious leaders are held."  Plaintiff allege The City of Los Angeles' policy

19  amounts to deliberate indifference to the rights of citizens such as plaintiff who are

20  not themselves religious leaders, but are engaged in a civil disagreement with houses

21  of worship and/or religious leaders as evidence by the actions of the police officers

22  captured by their Body Worn Cameras.

23      87.    Plaintiff alleges The City of Los Angeles policy of Contact With Clergy

24  as applied to her, used tax dollars in the form of police salaries and overtime, as well

25  as the use of police department properties, not to achieve a compelling state interest,

26  but to assist the church defendants in their stated purpose of removing plaintiff's

27  kitchen sink, in order to free themselves of having to pay Plaintiff the statutory

28  relocation assistance due her by law, in violation of Plaintiff Constitutional rights

- 32 -

[PROPOSED] FOURTH AMENDED COMPLAINT

1  under due process and equal protection. Plaintiff allege she suffered damage resulting

2  from the Defendants violating the establishment clause of the First Amendment.

3      88.    Plaintiff, in sum, is informed and believes and thereon alleges that the

4  defendant officers' conduct and the private actors as described herein was pursuant to

5  and in conformity with CITY OF LOS ANGELES' policy and practice. See Leev.

6  City of Los Angeles, 250 F.3d 668, 682-83 (9"t Cir.2001) citing and quoting Karim-

7  Panahi v. Los Angeles Police Dept, 839 F.2d 621,624 (9th Cir.1988) (Monell policy

8  practice claim filed under 42 U.S.C.§1983 will withstand a motion to dismiss "even if

9  the claim is based on nothing more than a bare allegation that the individual officers'

10  conduct conformed to official policy, custom, or practice.")

## FAILURE TO TRAIN

13      89.    In May of 2018, Plaintiff wrote the LAPD Discovery Section CPRA

14  Unit, requesting copies of the Los Angeles Police Department's crime and incident

15  reports concerning incidents occurring from 8/24/20]7 to 2/26/2018 involving

16  location, 2527 11th Ave.

17      90.    In response, Plaintiff was informed on May 24, 2018, that "Incident

18  reports are investigatory and in accordance with the California Government Code,

19  Section 6254(f) records of investigations conducted by or investigatory files compiled

20  by any local Police agency for law enforcement purposes are exempt from disclosure.

21  To the extent that records were located they are either investigatory records

22  themselves or properly part of an investigative file.  Therefore, I am denying your

23  request. The records may be provided pursuit to a subpoena or court order related to

24  pending litigation."

25      91.    LAPD's police policy is for officers to review their BWC footage before

26  writing their incident reports.  Therefore, higher-ups within the City of Los Angeles

27  were well aware of the contents of the officers BWC footage of November 30, 2017

1  and February 1, 2018.  Not only did they anticipate a lawsuit by or before May, 2018,

2  but senior officers freely offered the footage in the Defendant Officers' motion for

3  summary judgement.  Plaintiff allege, one could assumed they did this because no

4  one recognized the officers' violations of California and Los Angeles housing codes,

5  as executed and threaten.  No one recognized the violations of Plaintiff's

6  Constitutional rights, as executed and threaten.

7

8      92.    Plaintiff also alleges each Supervisory Sergeant or Lead Officers, except

9  for the two officers who came to her home on August 25, 2017, showed deliberate

10  indifference to Plaintiff attempts to explain facets of California and/or Los Angeles

11  housing laws.  Several stated as landlords or former property managers they were

12  confident in their positions.

13      93.    Los Angeles has been suffering under a housing crisis since 1997.

14  According to USC ANNEBERG SCHOOL FOR COMMUNICATION AND

15  JOURNALISM, The LAPD responded to 5,216 calls for service for landlord-tenant

16  disputes from Jan. 1 – Sept. 1 of year 2020.  They based their data from LAPD on

17  service calls involving disputes between Landlords and tenants from Jan. 1, 2020 -

18  Sept.1, 2020. The vast majority of calls came through the 77th Street Station, which

19  covers neighborhoods such as Hyde Park, Vermont Square and Manchester Square.

20  Low income neighborhoods under the geographic purview of the Southwest division

21  of LAPD.  Los Angeles Building and Safety estimates that 50% of the Single-Family

22  homes in Los Angeles are owned and rented by corporations.

23      94.    The Los Angeles Tenant Union, a member-funded housing-rights

24  organization, has resorted to organizing rapid response teams to stop illegal evictions

25  and lockouts. On Sept. 23, the organization mobilized its Hollywood local division to

26  support a tenant who was resisting eviction in the 1000 block of Beacon Ave.

27  in Hollywood.

28

[PROPOSED] FOURTH AMENDED COMPLAINT

95.     More than 57% of renters in Los Angeles are cost-burdened and pay
more than 30% of their income on rent, according to a <u>State of the Nation housing
report</u> released by Harvard's Joint Center for Housing Studies. The study found that
most low-income households pay more than half of their income for housing.
Angelenos who earn $30,000-$45,000 often spend more than 70% of their income on
rent.

96.     Yet, The City of Los Angeles' offers no formalize training in Landlord-
Tenant law for its officers.  If so motivated, LAPD officers can turn to
The Commission on Peace Officer Standards and Training (P.O.S.T.) to get a cursory
on-line understanding of the basic concepts, but nothing pertaining to the housing
codes of California, nor the specifics of Los Angeles Municipal Housing Codes
which dictates the housing rights of the Los Angeles citizens they are sworn to
protect.

97.     In 1989, the U.S. Supreme Court in City of Canton v. Harris (Canton)
decided that a governmental entity can be liable under Section 42 U.S.C.1983 for
deliberate indifference to training needs of governmental employees. In the years
since that decision, failure to train allegations have become commonplace in civil
rights lawsuits against law enforcement agencies. The battle rages with particular
intensity in use of force cases and is frequently fought by experts on police training.

98.     The Supreme Court concluded that "there are limited circumstances in
which an allegation of a failure to train can be the basis for liability under section
1983." Inadequacy of police training may serve as the basis for 1983 liability where
failure to train amounts to deliberate indifference to the rights of persons with whom
the police come in contact. Citing Monell v. New York Dept. of Social Services, the
Court stated that the "policies (of deliberate indifference to training) must be the
moving force behind the constitutional violations."

99.     The issues in failure to train cases are: (1) whether a training program is
inadequate; (2) whether the training inadequacy represents "city policy." under

- 35 -

1  Canton, (3) foreseeability of a particular constitutional violation is part of the

2  analysis.  (4) Recurrent situations involving potential danger to citizens'

3  constitutional rights are a strong basis for a failure to train claim.  Courts, as well,

4  will also focus on the adequacy of the training program in relation to tasks officers

5  can typically be expected to perform:

6  *"...It may happen that in light of the duties assigned to specific officers or employees,*

7  *the need for more or different training is so obvious, and the inadequacy so likely to*

8  *result in the violation of constitutional rights, that the policy makers of the city can*

9  *reasonably be said to have been deliberately indifferent to the need."*

10       100.  Plaintiff alleges that not one officer out of the 12, that violated her

11  constitutional rights had any formalized training from the City on Landlord-Tenant

12  law.  That includes the Two Supervising Sergeants, the Southwest Watch

13  Commander, officer Smith's Senior Lead Officer and the downtown command

14  officers who evaluated the BWC footage.   One only has to see the BWC footage of

15  November 30, 2017 and February 1, 2018 to conclude due to the officers lack of

16  knowledge of the housing laws of the State of California and The City of Los

17  Angeles, there is an obvious need for more or different training and the inadequacy

18  will likely to result in reoccurring violation of constitutional rights, so much so, that

19  the policy makers of the city can reasonably be said to have been deliberately

20  indifferent to Plaintiff constitutional rights and those of citizens in the future.

21

22         **Los Angeles Municipal Code § 161.601 (A)(B)(C)(D)**

23       101.  California Government Code § 815.6 provides that, if a public entity is

24  under a mandatory duty imposed by statute or regulation designed to protect against

25  the risk of a particular kind of injury, the public entity is liable for an injury caused by

26  its failure to discharge the duty unless it is shown it exercised reasonable diligence.

27  Plaintiff allege The City of Los Angeles, McCarty Memorial Christian Church,

28  Christian Church (Disciples of Christ) Pacific Southwest Region, R&R Remodeling,

Inc., and Jet Speed Plumbing, Inc., (Doing Business As) Ritz Plumbing, as public

entities were under a mandatory duty imposed by Los Angeles Municipal Code §

161.601 (A)(B)(C)(D) that was designed to protect Plaintiff from violations of her

Fourth Amendment right to be free from of unlawful searches and unlawful seizures,

to be free of violation of Plaintiff's Fourteenth Amendment rights of substantive and

procedural due process, and violation of her rights under LAMC § 161.601 (C)(1)(2).

Plaintiff alleges by the Defendants unlawful removal of Plaintiff's kitchen sink, the

Defendants interfered with and obliterated plaintiff's standing to petition for an

administrative hearing on the issue of the sink's removal.  Plaintiff allege the

Defendants action, violating Plaintiff's first amendment right under the Petition

Clause of the First Amendment.

### SIXTH CAUSE OF ACTION

(Violation of Defamation (Slander Per Se), Cal. Civ. Code § 44 (under

California Law on behalf of plaintiff as against all Defendants and DOES 1-10)

**FIRST INCIDENT**

102.    Plaintiff realleges and incorporates paragraphs 1-73.

On November 30, 2017 Defendants Martinez, stated in the presence of  Officers

Simmons and Kopaeck that Plaintiff Blackwell hadn't paid her rent in months, that

she was running a scam with her ambulance chasing attorney to get relocation money

from the Church, and that LADBS was leavening fees and fines against the Church

because Plaintiff won't let them in to dismantle the kitchen.

103.    On November 30, 2017, Defendants Johnson, stated in the presence of

Officers Simmons and Kopaeck that Plaintiff built the illegal kitchen herself and had

been sub-leasing without his permission that he was trying to evict her because she

won't pay her rent and she was holding the Church hostage.

///

1    **SECOND INCIDENT**

2        104.    On February 1, 2018, Defendant Atkins told Officers Smith and C.

3    **Maldonado**, that Plaintiff stopped paying her rent and she was trying to evict her but

4    couldn't get a trial date.

5        105.    Defendant Hendricks told Officers Smith and C. **Maldonado**, he was

6    careful when he broke into the building that housed Plaintiff's apartment because he

7    didn't want to get shot.

8        106.    Defendant Atkins told Sgt. Blocker to be careful because she's been

9    accosted by a tenant in the property with bad words and he should be concerned,

10    prompting Sgt. Blocker to call for backup

11        107.    Officer Smith told Sgt. Blocker that Plaintiff stopped paying her rent for

12    months and was being evicted.  Officer Smith told Sgt. Blocker, that Plaintiff was

13    415, irate.  Officer Smith told Sgt. Blocker Plaintiff was obviously, not paying her

14    rent.  Sgt. Blocker told the assembled Police officer that Plaintiff was preventing

15    MMCC from making repairs so she could continue staying at the property for free,

16    and she doesn't pay her rent.  Sgt. Blocker told the assembled Police once backup

17    arrives, we're going in.

18

19    108.    Officer Richardson told officers his nick named for Plaintiff, Annie Oakley and

20    pondered with them who she would shoot and in what order.

21                    **SEVENTH CAUSE OF ACTION**

22        109.    Plaintiff realleges and incorporates paragraphs 1-73.

23    (Violation of Los Angeles Municipal Code § 161.601 (A)(B)(C)(D) (under

24    California Law, Violation of the Petition Clause of the First Amendment of the

25    United States Constitution, on behalf of plaintiff as against The City of Los Angeles,

26    McCarty Memorial Christian Church, Christian Church (Disciples of Christ) Pacific

27    Southwest Region, R&R Remodeling, Inc., and Jet Speed Plumbing, Inc., (Doing

28    Business As) Ritz Plumbing, and DOES 3-10.

- 38 -

1  leading, facilitating, and participating in the unlawful intrusion into her home — an
2  area universally recognized as most sacred and protected.

3      113.   Based on the California common law and codified principles of
4  negligence and the tort of negligent infliction of emotional distress, defendant CITY
5  OF LOS ANGELES, DOES, each
6  Defendant Company and their respective Defendant employee/agent are liable for
7  damages caused to plaintiff by the individual defendants and DOES as well as
8  vicariously liable under California law (California Government Code § 815.2).

9
10                        PRAYER FOR RELIEF

11      114.   Based on the foregoing, plaintiff TAMU BLACKWELL demands a jury
12  trial and requests damages as follows:

13  1. Compensatory damages, including general and special damages, according to
14  proof;

15  (2). Punitive damages according to proof, except as against defendant City of Los
16  Angeles;

17
18  (3). Authorized costs, interest, attorney fees; and

19
20  (4).  Any additional just and proper relief.

21  I declare under penalty of perjury under the laws of the United States of America and
22  the State of California that the foregoing is true and correct.

23  Executed on the 21st day of October 2022 in the city of Los Angeles.

24
25
26                                    Tamu Blackwell
27                                    Tamu Blackwell
28                                      In Pro Se

- 40 -
[PROPOSED] FOURTH AMENDED COMPLAINT

PROOF OF SERVICE I, XAN BLACKWELL, declare:

I am over the age of eighteen. My business address is 355 Grand Ave., Los Angeles CA, 90071, Suite 2450. I am not a party to the within action.

On October 21, 2022, I served the foregoing document described as:

**NOTICE OF MOTION AND MOTION OF JOINDER OF DEFENDANTS AND TWO STATE CLAIMS, [PROPOSE] FOURTH AMENDED COMPLAINT**

BY PLACING true copies thereof enclosed in a sealed envelope addressed as follow:

**SHANT TASLAKIAN, Deputy City Attorney Los Angeles City Attorney's Office**
**200 Main Street 6th Floor, City Hall East**
**Los Angeles, California 90012**

**Tel. (213) 978-8722**

**By Mail**

I deposited such envelope, in the mail at Los Angeles California. The envelope was mailed with the postage thereon fully prepaid.

Executed this 21st day of October, 2022, at Los Angeles, California.

Xan Blackwell

XAN BLACKWELL